## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**KEVIN L. WILKE,**

        Plaintiff,

  v.                          **Case No. 14-cv-1144-pp**

**TANYA SHAW, TEODORO ROMANA,
HEATHER WITTIG, JEFFREY NETT,
PAUL HANNEMAN, BONNIE ALT,
SANDRA GEISTER, and
CORRECTIONAL HEATHCARE
COMPANIES, INC.,**

        Defendants.

---

### DECISION AND ORDER GRANTING SUMMARY JUDGMENT AS TO DEFNDANTS WITTIG, NETT, AND HANNEMAN (DKT. NO. 83), AND AS TO DEFENDANTS ALT AND CORRECTIONAL HEALTHCARE COMPANIES, INC. (DKT. NO. 91), AND DENYING SUMMARY JUDGMENT AS TO DEFENDANTS GEISTER, ROMANA AND SHAW (DKT. NO. 91)

---

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Dkt. No. 1. On September 19, 2014, Chief District Court Judge William Griesbach allowed the plaintiff to proceed on his claims that the defendants demonstrated deliberate indifference to his serious medical needs when they failed to provide treatment for his fingers, which had been injured at the Waushara County Jail. Dkt. No. 7. On December 29, 2014, the Clerk of Court reassigned this case to this court.

On April 25, 2016, defendants Paul Hanneman, Jeffrey Nett and Heather Wittig (the Jail Defendants) filed a motion for summary judgment. Dkt. No. 83.

Defendants Bonnie Alt, Correctional Healthcare Companies, Inc., Sandra Geister, Teodoro Romana, and Tanya Shaw (the Medical Defendants) filed their motion for summary judgment on May 9, 2016. Dkt. No. 91. This decision resolves those motions.

## I.    RELEVANT FACTS

The court takes the facts from the "Proposed Findings of Fact in Support of [the Jail Defendants'] Motion for Summary Judgment," dkt. no. 85, and the "Medical Defendants' Proposed Findings of Fact in Support of Summary Judgment, dkt. no. 93. In addition, because the plaintiff is representing himself, the court will consider facts from the plaintiff's sworn complaint (dkt. no. 1) and the attachments to the complaint, which were incorporated by reference (dkt. no. 1-1). The Seventh Circuit has instructed district courts to construe a sworn complaint by a *pro se* plaintiff as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).[1]

### A.    Parties

The plaintiff is no longer incarcerated, but he was incarcerated at the Waushara County Jail (the Jail) at the time of the events alleged in his complaint. Dkt. No. 85 ¶7, 8. Defendants Wittig, Hanneman and Nett are Waushara County Sheriff's Department personnel. Id. at ¶4. Defendants Shaw,

---

[1] The Medical Defendants argue that the court should disregard attachments submitted by the plaintiff because the plaintiff failed to submit an authenticating declaration or affidavit. Dkt. No. 101 at 2. The court favors deciding cases on the merits, and therefore declines to enforce these technical procedural rules against this *pro se* plaintiff. The plaintiff references and relies on these attachments in his sworn complaint. This is sufficient for the court to consider them on summary judgment.

Alt and Geister are nurses licensed to practice in Wisconsin; defendant Romana is now retired, but in 2014, was a physician licensed to practice in Wisconsin. Dkt. No. 93 ¶6. Throughout July, August and September of 2014, defendant Correctional Healthcare Companies, Inc., employed Alt, Shaw, Geister and Romana to provide on-site healthcare to the Jail inmates. Id. at ¶7.

B.    The Plaintiff's Injury

On Friday, June 27, 2014, the plaintiff was involved in a fight at the Jail. Dkt. No. 85 at ¶12. He initially told the jail staff that he wasn't injured (and at the disciplinary hearing, made no mention of any injury), and he initially denied that the fight had occurred. Id. at ¶¶12, 14. However, the plaintiff prepared a medical request form, dated June 27, 2014. Dkt. No. 1-1 at 33. The form was addressed to "Nurse" and stated: "I have either a broke[n] finger or dislocated [k]nuckle I'm not sure. I thought I [sic] would just go away but it[']s been 2 days. Thank you." Id. The plaintiff alleges that he gave the request to Officer Kirwan (who is not named as a defendant) while she was making her rounds, and she said that "she would give it to medical right away." Dkt. No. 1 at 5, 19.

Later that day, the plaintiff states that he spoke to the officer, and she assured him that she had given his request to the nurse "right away." Id. She said she did not know why the nurse hadn't seen him, but that the nurse "went home" and likely probably would not be back until the next day. Id. The plaintiff states that he put his hand under running cold water for the rest of the day to try to stop the swelling and pain. Id

The plaintiff states that the next day, he again asked to see the nurse (he does not clarify who he asked). Id. An unknown person told him that the nurse probably wouldn't be in because it was the weekend, so he'd have to wait until Monday (which would have been June 30, 2014). Id. at 5-6. The plaintiff states that his finger hurt so badly that he couldn't sleep. Id. at 6. He explains that he had two blisters forming on his knuckles, which he popped with a staple in order to relieve some of the pressure. Id. The plaintiff states that this "worked" in that it stopped some of the pain. Id.

The plaintiff explains that he was not seen by the nurse on Monday, so he assumed that she had the day off. Id. He states that he was allowed out of his cell on Tuesday for a court hearing. Id. He learned that the nurse and doctor were at the Jail, and he "got mad" that he still hadn't been seen. Id. He wrote another request to "Nurse," dated July 1, 2014, which stated:

> I can only write when I[']m out of my cell or I would have wrote this this morning when I seen you were here. I wrote you l[a]st week and told you I have at the very least a broken finger. The officer told me she gave you the request and you left. I[']ve had to pop a blister over one of my [k]nuckles to rel[ie]ve press[ure] and I think my fing[er] is going to be bent? Would you at least take a look. Thank you."

Dkt. No. 1-1 at 34.

That same day (July 1, 2014), Hanneman was working at the Jail, addressing the issue of which inmates needed medical care. Dkt. No. 85 at ¶27. Hanneman asked Geister, the on-duty nurse, if there were any other inmates that needed to see the doctor. Id. Geister told Hanneman that the plaintiff had written to her that his hand was injured. Id. She asked him if the plaintiff had

4

mentioned his hand to Hanneman. Id. Hanneman said no, and explained that he did not know about the injury. Id. He offered to talk to the plaintiff about his hand, but Geister said that she did not need to see the plaintiff that day. Id. ¶28. Later in the day, Hanneman asked one of the duty officers if the plaintiff had said anything to her about his hand; the officer responded that the plaintiff had not. Id. Hanneman states that this was his only involvement with the plaintiff's injury. Id. at ¶29.

The next day, on July 2, 2014, the plaintiff informed Corporal Lee Rokke (who is not named as a defendant) that his hand was hurt. Id. at ¶17. Within minutes, Rokke (at the plaintiff's request) took pictures of the plaintiff's hand. Id. The plaintiff told Rokke that he'd hurt his hand "doing push-ups." Id. Rokke contacted Geister, who told Rokke that the day before, the plaintiff had told *her* that his hand no longer was hurting. Id. According to Geister, she advised Rokke to send the plaintiff to the hospital. Dkt. No. 93 at ¶12. According to Rokke, "within a half hour, [the plaintiff] was on his way to the hospital." Dkt. No. 85 at ¶17.

At the hospital, the emergency room staff x-rayed the plaintiff's hand and diagnosed him with an avulsion fracture of his second and fourth fingers. Dkt. No. 1-1 at 10. The emergency room staff applied a splint to treat the injury and recommended that the plaintiff follow up with an orthopedic doctor in one day. Id. According to Romana, the plaintiff has a condition known as "mallet finger" or "baseball finger," which develops as a result of "the ligament on the finger detaching from the bone due to trauma." Dkt. No. 93 at ¶26. Romana states

that the accepted treatment for mallet finger is splinting and taping of the finger. Id. at ¶27; Dkt. No. 94-2, 1-2.[2]

The plaintiff states that he went back to the jail and wrote complaints and requests to medical, asking that he be sent to an orthopedic doctor as recommended. Dkt. No. 1 at 7; Dkt. No. 1-1 at 35. On July 7, 2014, the plaintiff wrote a request to "Nurse," asking why she would not answer any of his requests. Dkt. No. 1-1 at 37. He explained that he went to the hospital the prior week, and was supposed to see a specialist the next day. Id. He asked if the nurse had set up an appointment. Id. He also asked, "at the very least can you please change the dressing on my splints the[y're] falling off. Thank you!" Id. Alt saw the plaintiff that day, noting that he had a splint and tape on his finger. Dkt. No. 93 at ¶15.

---

[2] Romana relies on a description of the "mallet finger" condition from E-Hand.com, The Electronic Textbook of Hand Surgery. Dkt. No. 94-2. The description includes various questions and answers, such as:

> **What can you do to help?** Don't just ignore it. Some people ignore a bent finger, assuming that it will straighten out on its own. This is unlikely to happen. The longer the finger stays bent, the harder it will be to fix.
>
> **What can a therapist do to help?** Most mallet fingers can be treated by a therapist, who can provide a comfortable splint to straighten the finger, and exercises later on if stiffness is a problem. A good splint is important, because proper treatment involves wearing the splint continuously for a long time.
> . . .
>
> **What happens if you have no treatment?** Without any treatment, the appearance and ability to straighten the end joint of the finger will not improve. Additionally, if the injury is less than a month old, the problem may be worsened by using the finger without a protective splint of some sort.

On July 8, 2014, Romana "assessed" the plaintiff. Id. at ¶16. Although he noted that the plaintiff already was scheduled to see an orthopedist, id., the plaintiff states that Romana told him that the only reason the emergency room made that recommendation is because emergency room doctors "always tell you to follow up with your own Doctor," dkt. no. 1 at 8-9.

On July 10, 2014, the plaintiff was seen by Dr. Jones (who is not named as a defendant), an orthopedic doctor at CHN Medical Center in Berlin. Id. at 10. The plaintiff states that Jones confirmed his fingers were broken. Id.; Dkt. No. 1-1 at 1. Jones indicated that the plaintiff should have "stack splint immobilization of both the right index and ring fingers." Dkt. No. 1-1 at 2. He also asked to see the plaintiff back in a week so he could recheck the x-rays. Id. at 2. The plaintiff wrote requests asking for the follow-up appointment. Dkt. No. 1 at 10; Dkt. No. 1-1 at 41.

On July 14, 2014, the plaintiff wrote a complaint to Sheriff Nett, to which the sheriff responded on July 16. Dkt. No. 97-1 at 32. The plaintiff complained that, despite writing to medical about having two broken fingers, they didn't see him or answer him for an entire week. Id. He said that it wasn't until he requested that Jail staff take a picture of his fingers that Jail staff decided to send him to the hospital, where his injury was confirmed. Id. He complained that his fingers may now be bent for life and that he had to endure a week of pain, despite repeated requests for help. Id. Nett noted that it was his understanding that the plaintiff had sued Nett and the sheriff's department,

and informed the plaintiff of the process for obtaining documents and photographs. Id.

On July 15, 2014, Shaw examined the plaintiff. Dkt. No. 93 at ¶19. She noted that the plaintiff had "full mobility of his [right] ring finger at the knuckles, minimal swelling, [no] redness noted." She also said, "Pt has some mobility of [right] index finger, [not] able to bend at knuckles, slightly swollen and slight redness noted, Pt did not appear to be in any discomfort, he was tapping his injured/taped fingers on the exam table as the writer was reviewing his chart." Id.

On July 17, 2014, the plaintiff wrote a complaint addressed to "Nurse/Medical" in which he asked whether the ordered follow-up appointment with Jones had been scheduled. Dkt. No. 1-1 at 41. The next day, Shaw responded that she was still waiting for the records and would call Jones again. Id.

On July 22, 2014, Mobilex USA came to the Jail and took two x-rays of the plaintiff's hand. Dkt. No. 1 at 10. The radiologist observed that, "The right hand demonstrates no fracture or bony destructive lesion. Normal anatomic alignment is seen. No abnormal soft tissue swelling is seen." Dkt. No. 94-1 at 23. The radiologist concluded, "Normal right hand." Id. The radiology report states in all-caps at the top of the report, "This report is based solely upon the radiographic examination[.] Correlation with the clinical examination is essential[.]" Id.

On July 23, 2014, the plaintiff wrote a complaint addressed to "Sheriff." Dkt. No. 1-1 at 44. The plaintiff wrote:

> Sir I've wrote medical but they don[']t write back or see me. I need to know if I will be able to see the orthopedics to figure out the extent of my injur[ies]. I was to see him last week, and can I please get my fing[ers] retaped right now I have p[ie]ces of old tape t[i]ed around my splints. Thank you!

Id. Nett responded on July 25, 2014, stating, "This will be turned over to the medical staff." Id.

On July 25, 2014, Shaw saw the plaintiff, and reviewed the x-ray report with him. Dkt. No. 93 at ¶24. According to the plaintiff, she gave him the radiology report and told him his "fingers are fine." Dkt. No. 1 at 11. The plaintiff states that, despite the fact that his fingers were still swollen and painful and despite the fact that they still drooped, she took his splints. Id. at 12. The plaintiff was not examined by a doctor. Id. The plaintiff asked to see the specialist, but Shaw informed him that Jones did not need to see him again. Id. The plaintiff asserts that it was obvious that his fingers were not healed, as they continued to be swollen and to droop. Id. at 12-13; Dkt. No. 97-1 at 36, 37. The plaintiff also states that he "practically begged" Shaw to put the splints back on because the two weeks he had worn the splints had helped his ring finger improve. Dkt. No. 1 at 17.

The plaintiff continued to write complaints about his care. See Dkt. No. 1-1 at 45, 46; Dkt. No. 97-1 at 27, 30-31. On August 1, 2014, the plaintiff wrote a complaint to "LT," in which he complained that he was supposed to see an orthopedics doctor, but that the nurse got a diagnosis from radiology. Dkt.

No. 1-1 at 46. He explained that medical would not comment on his complaints, which was why he was complaining to the Jail administration. Id.

Romana examined the plaintiff again on August 12, 2014, and for the last time on September 18, 2014. Dkt. No. 93 at ¶24-25.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

10

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Exhaustion

According to the Prison Litigation Reform Act, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Various important policy goals give rise to the rule requiring administrative exhaustion, including restricting frivolous claims, giving prison officials the opportunity to address situations internally, giving the parties the opportunity to develop the factual record, and reducing the scope of litigation. Smith v. Zachary, 255 F.3d 446, 450-51 (7th Cir. 2001).

Neither the Jail Defendants or the Medical Defendants explain in their submissions what the grievance procedures are at the Jail. The court infers from the plaintiff's submissions that, if an inmate has a concern or complaint, he may submit a "Waushara County Jail Inmate Communication Form." See e.g., Dkt. No. 1-1, 24-49. On that form, an inmate is given the option to identify the correspondence as a "Request," a "Complaint/Concern," or an "Appeal." Id. Presumably, if an inmate submits a complaint/concern and is unhappy with the response, he next may file an appeal. With no additional guidance from the defendants, the court assumes that these are the only steps an inmate must

11

complete if he desires to exhaust the administrative remedies. It is unclear to the court whether or when this process is explained to Jail inmates.

If a court determines that an inmate failed to complete *any* step in the exhaustion process prior to filing a lawsuit, the court must dismiss the plaintiff's complaint. <u>Perez v. Wis. Dept. of Corrs.</u>, 182 F.3d 532, 535 (7th Cir. 1999) ("[A] suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits.").

### 1. The Jail Defendants

Despite their failure to explain the Jail's grievance process, the Jail Defendants assert that "the undisputed facts show that no grievance was submitted by [the plaintiff]" about the *Jail* staff. Dkt. No. 84 at 8. Instead, all of the plaintiff's complaints focus on the *medical* staff's failure to respond to his requests for help and/or properly treat his injury. The Jail Defendants argue that, because the plaintiff never filed a complaint about the Jail staff, he failed to exhaust his administrative remedies with respect to the Jail Defendants and the court must therefore dismiss his complaint as to those defendants.

The court agrees with respect to defendants Wittig and Hanneman. There are no documents indicating that Jail staff in general, or that Wittig or Hanneman in particular, ignored his requests for help. In fact, not only did the plaintiff *not* complain about the Jail staff, in several of his many written requests and complaints, he highlights the *responsiveness* of the Jail staff. <u>See</u>, <u>e.g.</u>, Dkt. No. 1-1, 28 ("I had regular Jail staff take picture[e]s of my hand at

12

that point your staff sent me to the hospital"); id. at 34 ("The officer told me she gave [the nurse] the request and [the nurse] left."). Because the plaintiff has provided no evidence that he ever submitted a complaint about *any* Jail staff's lack of response to his requests for medical treatment, the court finds that he did not exhaust the available administrative remedies with respect to Wittig and Hanneman. The court will dismiss the plaintiff's claims against Wittig and Hanneman without prejudice.

The court disagrees with the Jail Defendants' assertion that the plaintiff did not exhaust his administrative remedies with respect to Sheriff Nett. On July 14, 2014, the plaintiff wrote a complaint to Nett, asserting that medical staff had been ignoring his requests for treatment. Dkt. No. 1-1 at 28-29. He asked Nett what Nett was going to do to ensure it didn't happen again. Id. at 29. On August 4, 2014, the plaintiff sent a complaint to "the nurse, the Jail LT and the Sheriff." Id. at 30. In the complaint, he detailed the lack of response he was receiving from medical staff, and asked to receive additional treatment because his fingers were "bent to hell" and he was unable to "even bend [his] index finger." Id. Finally, on August 17, 2014, the plaintiff sent an appeal to Nett, complaining that he was "being charged for medical treatment that was given to [him] weeks late" and that his "finger will never be the same since this doctor visit was so late and the follow up was den[ied]." Id. at 31-32. In essence, the plaintiff complained to Sheriff Nett that the medical staff at the Jail were not doing their jobs, and he asked Nett to intervene both via complaint and via appeal. Accordingly, the court finds that the plaintiff

13

exhausted his deliberate indifference claim against Nett before he filed this lawsuit.

## 2. The Medical Defendants

The Medical Defendants argue that "despite the voluminous nature of [the plaintiff's] submissions," he did "not appeal any of the responses he received either from medical staff or jail staff." Dkt. No. 101 at 3.

As demonstrated above, the Medical Defendants' assertion is not accurate. The plaintiff filed an appeal on August 17, 2014, in which he specifically referenced the lack of medical care about which he had filed many previous complaints. Dkt. No. 1-1 at 31-32. The court finds that the plaintiff exhausted his administrative remedies as to the medical defendants.

C. Deliberate Indifference

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997)[3] (citations omitted). This standard contains both an objective element (that the medical needs be sufficiently serious) and a subjective element (that the officials act with a sufficiently culpable state of mind). Id.

---

[3] It's likely that plaintiff was a pretrial detainee at the time of these events. If so, his deliberate indifference claims arise under the Fourteenth Amendment, not the Eighth Amendment. This distinction is not critical, however, because the standard for medical care claims under the Fourteenth and Eighth Amendments are the same. See Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003).

Nett and the Medical Defendants do not dispute that the plaintiff's medical needs were sufficiently serious, so the court will focus only on the second prong of the deliberate indifference standard—namely, whether Nett and the Medical Defendants acted with a sufficiently culpable state of mind.

### 1. Defendant Sheriff Nett

The plaintiff argues that he repeatedly complained to Nett about the medical staff's failure to properly treat his injury, but that Nett did nothing to address those complaints.

To establish a deliberate indifference claim against Nett based on his denial and/or failure to respond to the plaintiff's complaints about his medical care, the plaintiff must show that Nett personally was responsible for the alleged constitutional deprivation. See Antonelli v. Sheahan, 81 F.3d 1422, 1428 (7th Cir. 1996). Just because the plaintiff complained to Nett about his medical treatment does not mean that Nett bears personal responsibility for the alleged misconduct. See Adams v. Durai, 153 Fed.Appx. 972, 975 (7th Cir. 2005). "Especially in the area of medical care, prison officials who are not physicians themselves are entitled to defer to the medical judgment of staff physicians." Id. (citing Perkins v. Lawson, 312 F.3d 872, 875-76 (7th Cir. 2002)).

The plaintiff first appears to have complained directly to Nett on July 14, 2014. Dkt. No. 1-1 at 28. This was seventeen days after the plaintiff got into the fight, and twelve days after he went to the emergency room. The plaintiff asked Nett what Nett was going to do about the fact that the plaintiff wasn't

being treated. He also asked Nett for certain of his records (including the photos of his fingers). Id. at 28-29. Nett responded himself, indicating that he understood that the plaintiff had sued him and the sheriff's department, and telling the plaintiff how to get the documents he'd requested. Id. Nett's response did not address (at least, on the complaint form) the plaintiff's question about what the sheriff planned to do about the lack of medical treatment. Id.

The plaintiff next appears to have complained directly to Nett a week later, on July 20, 2014; this complaint related only to the plaintiff's request for documents, and Nett—again, responding himself—reiterated that the plaintiff needed to follow the Jail's record request procedures. Id. at 43. The plaintiff next complained to Nett on July 23, 2014. Dkt. No. 1-1 at 44. This was the day after the date of the Mobilex x-ray report, which indicated that the plaintiff's right hand was "normal." Dkt. No. 94-1 at 23. In this complaint, the plaintiff asked to see an orthopedic doctor to find out the extent of his injuries and to get his fingers re-taped. Dkt. No. 1-1 at 44. Nett again responded himself, stating, "This will be turned over to the medical staff." Id. The plaintiff again complained to Nett (and the "Nurse" and the "Jail LT") on August 4, 2014. Id. at 30. This time, Shaw responded to the complaint, stating that she would put the plaintiff on the visiting list to see the doctor on August 12, 2014. Id. at 30. (Romana did see the plaintiff on August 12. Dkt. No. 93 at ¶24.) The plaintiff next filed an appeal to Nett on August 17, 2014, id. at 31-32; there is nothing in the record to indicate whether Nett responded to the appeal.

The record contains evidence that members of Nett's staff did turn the plaintiff's requests for medical attention over to the nurse (as Nett indicated in his response to the July 23 complaint). In her affidavit, jail administrator (and lieutenant) Heather Wetting states several times that "[a]ny requests for medical attention were given directly to the nurse or placed in the nurse's bin." Dkt. No. 87 at ¶11. See also, id. at ¶¶12, 15. Corporal Rokke reported that when the plaintiff complained about his injury on July 2, 2014, Rokke contacted the nurse, then contacted dispatch to have an officer come take the plaintiff to the emergency room. Dkt. No. 94-1 at 3. Nett himself declared that he has no medical training, and "relied on [his] staff to handle any inmate complaints." Dkt. No. 89.

Because Nett is not himself a medical professional, he (and members of the sheriff's department) were entitled to defer medical decisions and judgments to the medical staff. Unless Nett was personally involved in depriving the plaintiff of the medical care—for example, directing his staff not to send the plaintiff's requests for medical care to the nurse, or directing medical staff not to respond to the plaintiff—he has no Eighth Amendment liability. Nett did not become responsible for the medical staff's exercise of medical judgment (or lack thereof) simply by virtue of receiving the plaintiff's complaints. See Adams, 153 Fed.Appx. at 975. And the evidence indicates that he responded to at least one of those complaints by indicating that the plaintiff's concerns were being turned over to the medical staff. Because the plaintiff has not provided evidence that Nett was personally involved in any

deprivation of medical care, the court will grant summary judgment in favor of Nett.

## 2. The Medical Defendants

The plaintiff asserts deliberate indifference claims against five medical defendants: Correctional Healthcare Companies, Inc.; "Nurse that worked 6-27-14 – 7-2-14," dkt. no. 1 at 3, who the Medical Defendants identified as Nurse Sandra Geister, dkt. no. 93 at 1; "Nurse that worked 7-3-14  -- 7-10-2014," dkt. no. 1 at 3, whom the Medical Defendants identified as Nurse Bonnie Alt, dkt. no. 93 at 1; Nurse Tanya Shaw; and Doctor Teodoro Romana. The court will address each defendant in turn.

### i. *Correctional Healthcare Companies, Inc.*

The Seventh Circuit has held that, "[A] corporate entity violates an inmate's constitutional rights 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.'" Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004) (quoting Estate of Novack ex rel. v. County of Wood, 226 F.3d 525, 530 (7th Cir.2000)). Such liability is not based on a theory of vicarious liability or *respondeat superior*, because courts will not hold a corporate entity responsible for its employees' misconduct. Id. Instead the corporate entity's practice or policy must be the "direct cause" or "moving force" behind the violation. Id.

Here, the plaintiff has provided no evidence of a policy or practice that resulted in the alleged constitutional violation. He argues only that the

individual Medical Defendants ignored him and failed to properly treat his injuries. This is the same as arguing that Correctional Healthcare Companies, Inc., should be held responsible for the alleged bad acts of its employees. Section 1983 does not permit liability on this basis. The court will grant summary judgment as to Correctional Healthcare Companies, Inc., and dismiss it as a defendant.

*ii.    Nurse Sandra Geister*

According to Corporal Rokke, Nurse Sandra Geister was working at the Jail "the past week"—the week prior to July 2, 2014—"due to the normal nurse being on leave." Dkt. No. 94-1 at 3. Presumably Nurse Bonnie Alt was the "normal nurse" who was on leave during that time.

The record indicates that the plaintiff first requested help for his hand injury on Friday, June 27, 2014, through a request he addressed to "Nurse." Dkt. No. 1-1 at 33. In the request, the plaintiff stated that he thought either his finger or his knuckle was broken. Id. The plaintiff alleges that he gave the request to Officer Kirwan while she was making her rounds, who said she would deliver it to "medical" immediately. Dkt. No. 1 at 5, 19. Kirwan later told the plaintiff that she'd delivered the request, and didn't know why the nurse had not responded. Id. On Tuesday, July 1, 2014, when Hanneman asked Geister if there were any inmates who needed to see the doctor, Geister told Hanneman that the plaintiff had written her about his injured hand. Dkt. No. 85 at ¶27. She also told Hanneman that she did not need to see the plaintiff

that day, and that Hanneman didn't need to talk to the plaintiff that day. Id. at ¶28.

At 7:20 p.m. on the evening of July 1, 2014, the plaintiff wrote to "Nurse" and again informed her that "at the very least" he has a "broken finger." Dkt. No. 1-1 at 34. He also informed her that he had to pop a blister over the weekend in order to relieve pressure and that his finger was "bent." Id.

At some point during the day on July 2, 2014—five days after the plaintiff's first request—the plaintiff told Rokke about his hand. Dkt. No. 85 at ¶17. Rokke took photographs of the plaintiff's hand, then contacted Geister. Geister told Rokke that on July 1 (the day before), the plaintiff had told her his hand no longer hurt. Id. The Medical Defendants' proposed findings of fact includes a time line, which asserts that on July 2, 2014, Geister "advises officer [presumably Rokke] to send [the plaintiff] to the hospital." Dkt. No. 93 at ¶12. In support of that assertion, the defendants refer to "Ex. 1, p. 3."

This appears to be a reference to Exhibit 1 to Romana's declaration (dkt. no. 94-1), which is a jail incident report written by Rokke and dated July 2, 2014. Dkt. No. 94-1 at 3. In this report, Rokke states that "[Geister] told me that on Tuesday, July 1, she called [the plaintiff] down to see the doctor but he told the Officer that his hand was no longer bother him. After I told [Geister] my observations of his hand she said that we should send him to the hospital and that an officer can take him." Id. Rokke indicates that he contacted dispatch at 8:39 p.m.—twenty-nine minutes after he'd seen the plaintiff's hand—to ask for an officer to come. Id.

Geister's own declaration states only that, "[o]n July 3, 2014, I was called by Correctional Officer Rokke, who described Wilke's finger injury and symptoms. I directed him to send Wilke to the emergency room for treatment." Dkt. No. 95.

At the summary judgment stage, the court must view the evidence, and draw all reasonable inferences from it, "in the light most favorable to the non-moving party." Cox v. Acme Health Services, Inc., 55 F.3d 1304, 1308 (7th Cir. 1995) (citations omitted). Even following this directive, the court concludes that the plaintiff has raised a genuine dispute as to an issue of material fact with regard to whether Geister was deliberately indifferent to his medical needs. The record contains evidence that the plaintiff first wrote a request to Geister on June 27, 2014. According to Rokke, Geister told him on July 2 that she'd sought to fetch the plaintiff down to see the doctor, but that an officer had told her that the plaintiff had said his hand didn't hurt anymore. She apparently accepted this, despite the fact that the June 27 request indicated that the plaintiff thought his finger or knuckle was broken. Only when Rokke reported what he saw on July 2 did Geister act, and even then, she did not see the plaintiff herself. She recommended that an officer take the plaintiff to the hospital. (She attests that this happened on July 3; the evidence indicates that the plaintiff went to the hospital July 2.)

The Seventh Circuit has held that if a plaintiff "puts forth sufficient evidence to permit a reasonable jury to conclude that [a defendant's] inaction substantially and unreasonably delayed necessary treatment, then he has done

enough to withstand summary judgment." <u>Conley v. Birch</u>, 796 F.3d 742, 747 (7th Cir. 2015) (internal quotations and citations omitted). The plaintiff has done so here, or at least raised a genuine dispute as to this material fact. The court will deny summary judgment as to Geister.

<em>iii.    Nurse Bonnie Alt</em>

The Medical Defendants identified Nurse Bonnie Alt as being on duty at the Jail from July3 through July 10, 2014.

The plaintiff argues that Alt failed to promptly schedule an appointment with an orthopedic doctor as recommended by the emergency room staff on July 2, 2014. On July 3, 2014—the day after his hospital visit—the plaintiff wrote a complaint to "LT," indicating that he'd seen the nurse that day, and that he'd had an officer tell her that he was supposed to see an orthopedic doctor. Dkt. No. 1-1 at 35. (Wittig responded on July 7, indicating that she would speak to the nurse regarding the issue. <u>Id.</u>)

On July 7, 2014, the plaintiff wrote a complaint to "Nurse," asking her why  she wasn't responding to his requests and seeking to confirm correctional officers' assurances that she was setting up an appointment with the doctor. <u>Id.</u> at 37. He asked that, "at the very least," could she please change the dressing on his splints. <u>Id</u>.

Alt examined the plaintiff that day and changed the dressings on his splints. Dkt. No. 93 at ¶15. On July 8, 2014, in response to a request the plaintiff had made, Alt wrote "on list to see today." Dkt. No. 94-1 at 14. The

plaintiff concedes that he saw Dr. Romana on the 8th, dkt. no. 1 at 8, and that he saw Dr. Jones, an orthopedic doctor, on July 10, 2014, id. at 10.

The court finds that the plaintiff has failed to raise a genuine dispute as to the material fact of whether Alt acted with deliberate indifference. The plaintiff went to the emergency room on Wednesday, July 2, 2014. It appears that Alt returned to work on either July 2 or July 3, 2014. On July 3, the plaintiff wrote a complaint to the lieutenant, complaining that the nurse did not see him that day although he'd "had an officer tell her" that he needed to see an orthopedic doctor. Dkt. No. 1-1 at 35. But Lt. Wittig's response at the bottom of that complaint is dated July 7—four days later. While the plaintiff's complaint indicates that he'd "had an officer" tell Alt that he needed to see an orthopedic doctor, there is nothing in the record to show who that officer was, or whether that officer relayed the message to Alt on July 3. There is nothing to show that on July 2 or July 3, Alt was aware that the plaintiff needed to see an orthopedic doctor.

Friday, July 4 was a holiday, but the plaintiff alleges that he was "told"— he does not say by whom—on that day that the nurse was coming in on Saturday (July 5) "just to see me." Dkt. No. 1 at 7-8. He indicates that the nurse did not see him on Saturday, July 5, 2014, at which point, he began complaining to administration. Id. at 8. Again, while the plaintiff heard from some unidentified person that Alt was coming in to see him on Saturday, the record contains no evidence that Alt actually was aware of the plaintiff's need

to see an orthopedic doctor, or even that he had a medical need, over the weekend of July 5-6, 2014.

Alt saw the plaintiff (and changed his dressings) on Monday, July 7, 2014—the same day he wrote his complaint asking why he was being ignored. Dkt. No. 94-1 at 13. She noted on the plaintiff's July 7 complaint that he would see the doctor the next day. Id. at 13-14. The plaintiff did, in fact, see Dr. Romana the next day, July 8, and Romana told the plaintiff that there was nothing more she could do for him, because he'd already been seen in the ER and because Alt already had scheduled an appointment for him at the orthopedic clinic. Id. at 15. And the plaintiff saw Dr. Jones, the orthopedic doctor, two days later.

Viewing the evidence and drawing the inferences in the light most favorable to the non-moving party, the court concludes that as soon as Alt became aware of the plaintiff's requests—on July 7, 2014—she saw him, changed his splints, made an appointment for him to see Dr. Romana, and made an appointment for him to go to the orthopedic clinic. No jury could reasonably conclude that Alt was deliberately indifferent to the plaintiff's medical needs. The court will grant summary judgment as to Alt.

### iv.    Doctor Teodoro Romana and Nurse Tanya Shaw

The plaintiff argues that Romana and Shaw demonstrated deliberate indifference when they decided to remove the plaintiff's splints despite the fact that his fingers were still swollen and his index finger still drooped. Romana and Shaw respond that the plaintiff's finger fractures were healed, so the

splints were no longer necessary. They further argue that the plaintiff has failed to demonstrate that his injury (a drooping index finger) was a result of their decision to remove his splint. The court finds that the plaintiff has set forth sufficient evidence to create a genuine dispute as to the material fact of whether Shaw and Romana's decision to remove the plaintiff's splint when they did demonstrated deliberate indifference to his serious medical needs.

On July 10, 2014, Jones, the orthopedic doctor, placed the plaintiff's right index and ring fingers in a stack splint. Dkt. No. 1-1 at 1. He asked to see the plaintiff again in a week so that he could recheck the x-rays. Id. at 2. On July 15, Shaw examined the plaintiff. She noted that his ring finger was healing, but that he was still unable to bend his index finger at the knuckle and it was slightly swollen and red. Dkt. No. 93 at ¶19. On July 22, a mobile unit at the Jail took x-rays of the plaintiff's hand. Dkt. No. 1 at 10. The radiologist's report concluded that the plaintiff had a "normal right hand," but it stated that the conclusion was based only on the radiographic examination and that correlation with a clinical examination was "essential." Dkt. No. 94-1 at 23.

On July 25, Shaw examined the plaintiff, and told him his "fingers are fine." Dkt. No. 1 at 11. She then removed the splints. Id. The plaintiff states that his fingers were *not* fine. While his ring finger had improved, his index finger remained swollen, and still drooped. Id. at 12-13. The plaintiff submitted photographs of his finger, which were taken that day. Dkt. No. 97-1 at 36, 37. It is unclear whether Shaw communicated the physical appearance of the

plaintiff's hand to Romana; however, Romana did not examine the plaintiff again until August 12, 2014, about a month and one-half after the injury and almost three weeks after Shaw removed the splints.

The deliberate indifference standard "does not permit claims for mere negligence or claims alleging that a reasonable medical judgment unfortunately led to a bad result." <u>Conley</u>, 796 F.3d at 748. Still, a prisoner does not have to show that he was literally ignored; he may demonstrate deliberate indifference even if he received some minimal treatment. <u>Id</u>. Here, the plaintiff had a splint from July 2 through July 25. The question is whether a jury could reasonably conclude that Shaw and Romana's decision to deny the plaintiff the splint after July 25 amounted to deliberate indifference. The court concludes that it could.

Romana submitted an excerpt from the "Electronic Textbook of Hand Surgery," describing Mallet Finger, the condition that Romana asserts the plaintiff suffers from. Dkt. No. 94-2. Mallet finger occurs when the tendon which pulls on the end bone to straighten the finger pulls away; often the tendon tears away from its attachment to the bone, causing the end joint of the finger to bend downward. <u>Id</u>. at 1. People with Mallet Finger are cautioned not to ignore the condition, because "the longer the finger stays bent, the harder it will be to fix." <u>Id</u>. at 2. Further, "A good splint is important, because proper treatment involves wearing the splint continuously *for a long time*." <u>Id</u>. (emphasis added). "Without any treatment, the appearance and the ability to straighten the end joint of the finger will not improve. Additionally, if the injury

is less than a month old, the problem may be worsened by using the finger without a protective splint of some sort." Id.

The plaintiff explains that at the time Shaw decided to remove the plaintiff's splint, his *ring* finger had improved quite a bit; his index finger, however, continued to droop and was swollen. Based on the document submitted by Romana, a jury could reasonably conclude that if Shaw and Romana had allowed the plaintiff to wear the splint longer, his index finger may have improved as his ring finger had improved.

The court notes that this is not a situation where the plaintiff is merely disagreeing with a medical official's exercise of judgment. There is no evidence that either Shaw or Romana determined that continuing to wear the splint would not help straighten the plaintiff's index finger. They don't appear even to have considered this possibility, despite the fact that wearing a splint for a long time (presumably more than three weeks—the document indicates that an injury that is "less than a month old" is likely to worsen without a splint, dkt. no. 94-2) was the recommended treatment for Mallet Finger. Instead, both defendants state that the reason they removed the splints was that the plaintiff's *fractures* had healed. They do not appear to have considered whether the *tendon* in his index finger had healed, and given that the plaintiff's finger still drooped, that fact was in question. This is why a clinical examination of the plaintiff's hand was necessary—to determine whether the plaintiff needed to continue to wear the splint so that the *tendon* that was supposed to be attached to his finger end joint could heal.

There is no evidence that Shaw conferred with Romana after examining the plaintiff's hand on July 25; she just removed the splints and told the plaintiff his "fingers are fine," ignoring the swelling and droop of his index finger. Romana, too, just ordered the splints removed; he did not examine the plaintiff after receiving the radiologist's report, despite its caution that the findings needed to be correlated with a clinical examination. Thus, whether their decision to remove the splints when they did demonstrated deliberate indifference to the plaintiff's injury is a factual question that should be left to a jury.

## III. CONCLUSION

The court **ORDERS** that defendants Paul Hanneman, Jeffrey Nett, and Heather Wittig's motion for summary judgment is **GRANTED.** Dkt. No. 83.

The court **ORDERS** that Medical Defendants' motion for summary judgment (Dkt. No. 91) is **GRANTED** as to Bonnie Alt and Correctional Healthcare Companies, Inc., and **DENIED** as to Sandra Geister, Teodoro Romana, and Tanya Shaw.

The court will recruit counsel to represent the plaintiff on his surviving claims.

Dated in Milwaukee, Wisconsin this 28th day of February, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge